UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, <br> BRIDGETTE CARMICHAEL, <br><br> Plaintiff, <br><br> v. <br><br> RAYMOND GREGORY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> )  Civil Action No. 14-1702 (RJL) <br> ) <br> ) <br> ) <br> ) <br> ) |

# UNITED STATES' AND RELATOR'S MOTION FOR
# DEFAULT JUDGMENT AND TO SET RELATOR'S SHARE

By and through their undersigned counsel, the United States of America ("United States" or "Government") and Relator Bridgette Carmichael ("Relator" or "Carmichael") jointly and respectfully move for entry of default judgment against Defendant Raymond Gregory ("Gregory") pursuant to Federal Rule of Civil Procedure ("Rule") 55(b)(2). Specifically, the United States and Relator seek treble damages on Count I (False Claims Act -- False Claims) (the "Presentment Claim") of the Government's Complaint in Intervention (R.12) ("Government's Complaint") in the amount of $246,999.00 and civil penalties on that cause of action in the amount of $341,000.00, for a total monetary judgment of $587,999.00. The United States and Relator also respectfully request that the Court set Relator's share of any proceeds the United States is able to collect on this judgment as fifteen percent (15%) pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3730(d)(1).[1] The grounds for this Motion are as follows.

---

[1] Should this Motion be granted, Relator would also be entitled to reasonable expenses, reasonable attorney's fees, and costs, under the FCA. *See* 31 U.S.C. § 3730(d)(1). As such, if this Motion is granted, Relator intends to file a motion for that additional relief within fourteen (14) days of the Court's entry of judgment. Fed. R. Civ. P. 54(d). Additionally, if the Court grants this Motion, Relator intends to voluntarily dismiss the additional claim she brings in her personal

**FACTUAL BACKGROUND**

As alleged in the Government's Complaint[2] and detailed below, as part of the Section 8 Housing Choice Voucher Program (the "Program") funded by U.S. Department of Housing and Urban Development ("HUD") Gregory agreed to charge Carmichael a specific sum as rent for the Property (defined below) as a condition of receiving payments from that benefit program, which is designed to provide housing subsidies for low-income individuals. Despite his agreement, throughout the life of her tenancy Gregory knowingly charged Carmichael more than permitted. This conduct plainly violated the False Claims Act.

## I. HUD'S SECTION 8 HOUSING CHOICE VOUCHER PROGRAM

The Section 8 Housing Choice Voucher Program is a federal program that assists low-income individuals in obtaining decent, safe, sanitary, and affordable housing. Gov't Compl. ¶ 17. The Program is authorized by Section 8 of the U.S. Housing Act of 1937, 42 U.S.C. § 1437(f). *Id.* ¶ 18. Regulations governing the Program are contained in Part 982 of Title 24 of the Code of Federal Regulations. *Id.* ¶ 19. Pursuant to contracts with HUD, DCHA administers the Program in its jurisdiction on behalf of HUD and HUD pays or reimburses DCHA for housing assistance payments it authorizes under the Program. *Id.* ¶ 20.

---

capacity against Gregory -- Count II (Unjust Enrichment) of Realtor's Complaint (R.1) -- and the United States intends to dismiss voluntarily its False Statement cause of action -- Count II of the Government's Complaint -- which will dispense with all claims in this action.

[2]   The Clerk of the Court entered default against Mr. Gregory on May 18, 2016. R.15 (Entry of Default). Accordingly, the well-pled allegations in the Government's Complaint are deemed admitted as to Mr. Gregory. *See, e.g., Fanning v. Wellman Dynamics Corp.*, 113 F. Supp. 3d 172, 174 (D.D.C. 2015) (Leon, J.) (granting motion for default judgment); *Guarantee Co. of N. Am. USA v. Barrera*, 908 F. Supp. 2d 39, 42 (D.D.C. 2012) (Kollar-Kotelly, J.) (granting motion for default judgment).

Under the Program, DCHA enters into a HUD form contract known as a Housing Assistance Payment ("HAP") contract with the landlord of a dwelling unit who wishes to participate in the Program. *Id.* ¶ 21. The HAP contract entitles the landlord to receive a monthly housing assistance payment on behalf of an identified and eligible tenant. *Id.* ¶ 22. Contemporaneously, the landlord and the tenant enter into a lease for the residence, which must include certain federally mandated terms and conditions. *See, e.g.*, 24 C.F.R. § 982.308. *Id.* ¶ 23. Relevant here, a HAP contract prescribes the monthly housing assistance payment the landlord will receive, the monthly rent payment the tenant owes to the landlord, and the total monthly amount (the sum of assistance and rent payments) the landlord is to receive. *Id.* ¶ 24.

The housing assistance payment and the portion of the total rent due from the tenant may fluctuate during the life of the HAP contract, but the total monthly amount remains constant, absent a landlord's successful application to have the total permissible rent increased. *Id.* ¶ 25. HUD regulations prohibit a landlord from receiving, and a public housing authority such as DCHA from approving, rents in excess of the "reasonable rent." 24 C.F.R. § 982.507. *Id.* ¶ 26. HUD regulations further prohibit landlords from retaining payments exceeding the total monthly amount (24 C.F.R. § 982.451(b)(3)) and from charging a tenant any sums beyond the total monthly amount less the housing assistance payment. 24 C.F.R. § 982.451(b)(4). *Id.* ¶ 27.

## II.   BACKGROUND ON THE PARTIES.

Carmichael is a recipient of housing assistance and an eligible tenant under the Program. Gov't Compl. ¶ 28. Just prior to October 2008, Carmichael identified a home participating in the Program owned by Gregory, the Property. *Id.* ¶ 29. Carmichael and Gregory tentatively agreed that the rent for the premises would be $1,800.00 per month with an effective date of October 1, 2008, and executed an initial lease to that effect. *Id.* ¶ 30.

**III.     DCHA APPROVES GREGORY'S PREMISES FOR PARTICIPATION IN THE PROGRAM WITH CARMICHAEL AS TENANT.**

Subsequently, Carmichael and Gregory applied to DCHA to have their lease approved under the Program. Gov't Compl. ¶ 31; Request for Tenancy Approval, enclosed herewith as Exhibit 1 ("Mot. Ex. 1"). DCHA determined that the fair market rent was less than that initially agreed to by Carmichael and Gregory (*i.e.*, less than $1,800.00) and set the total monthly payment or "reasonable rent" to be $1,603.00 per month. Gov't Compl. ¶ 32; Letter Agmt., Mot. Ex. 2. Also, DCHA set the initial federal housing assistance payment to be $898.00 per month and Carmichael's obligation to be $705.00 per month. Gov't Compl. ¶ 33; Letter Agmt., Mot. Ex. 2.

On or about October 28, 2008, Carmichael and Gregory visited DCHA's offices and executed the requisite paperwork to complete the rental and have it be accepted into the Program. *Id.* ¶ 34. Gregory executed a HAP contract with DCHA (the "HAP Contract") setting the total monthly rent payment to be $1,603.00 per month and the initial housing assistance payment to be $898.00 per month. *Id.* ¶ 35; *see also* HAP Contract, Mot. Ex. 3. Carmichael and Gregory also executed a letter agreement documenting their acceptance to the Program (the "Letter Agreement"), which contained the same terms and setting Carmichael's initial payment obligation to be $705.00 per month. Gov't Compl. ¶ 36; Letter Agmt., Mot. Ex. 2.

Additionally, Carmichael, Gregory, and DCHA executed a Lease Information Form agreement (the "LIF Agreement") that again specified the respective payment amounts. Gov't Compl. ¶ 37; LIF Agmt., Mot. Ex. 4. The LIF Agreement also expressly informed Gregory that he could not charge Relator additional sums and any rent increases required DCHA approval. Gov't Compl. ¶ 38; LIF Agmt., Mot. Ex. 4. Specifically stating that "The Owner/Landlord may not change the rent without HCVP [*i.e.*, DCHA] approval. The Owner/Landlord may not make

side deals to charge additional amounts to the tenant." *Id.* In addition to signing the LIF Agreement, Gregory and Carmichael also specifically initialed this passage of that agreement. *Id.*

As part of the materials Gregory submitted to participate in the Program, he executed and submitted to DCHA an Authorization Agreement for EFT/Direct Deposit ("Direct Deposit Agreement"), in which he agreed to demand, receive, and accept housing assistance payments through electronic direct deposits. Gov't Compl. ¶ 39; Direct Deposit Agmt., Mot. Ex. 5. As part of that Agreement, Gregory certified "that I am in compliance with, and are following all rules and regulations that accompany these payments in accordance with my [HAP Contract] issued by DCHA." *Id.*

## IV. GREGORY CHARGED CARMICHAEL MORE THAN PERMITTED UNDER THE PROGRAM YET CONTINUED TO DEMAND AND ACCEPT PROGRAM PAYMENTS

Despite the mandates of the above cited authorities and the terms of the signed agreements, Gregory required Carmichael to pay more than the total monthly amount from the outset of her tenancy. Gov't Compl. ¶ 40. Specifically, although Gregory amended the initial lease to reduce the total rent required thereunder, Gregory set the rent at $1,700.00 per month, almost $100.00 more than permitted by his HAP contract with DCHA. *Id.* ¶ 41; *see also* $1700 Lease, Mot. Ex. 6.

Further, although Carmichael's share of the total monthly amount varied over time based on rates set by DCHA in light of her financial circumstances, Gregory continued to charge Carmichael through July 2012 nearly $100.00 more than the total monthly amount permitted by DCHA while receiving and accepting federal assistance payments under the Program. Gov't Compl. ¶ 42. Specifically, Gregory continued to demand, receive, and accept electronic direct deposits of housing assistance payments pursuant to the terms of his agreements with DCHA, notwithstanding his material violations of those agreements and Program rules. *Id.* ¶ 43.

Gregory's failure to obtain DCHA approval of this increased rent was not simply a mistake or a misunderstanding -- Gregory knew that formal approval of rent increases were required by DCHA. *Id.* ¶ 44. Indeed, in December 2011, Gregory sought formal approval of an overall increase from $1,603.00 per month to $1,803.00 per month. *Id.* ¶ 45; Request to Increase, Mot. Ex. 7. DCHA denied Gregory's request in February 2012 and affirmed the total monthly amount would remain at $1,603.00 per month. Gov't Compl. ¶ 45; Denial of Increase, Mot. Ex. 8. Despite acknowledging through his actions his understanding that DCHA's formal approval of any rent increases was required, Gregory nonetheless compelled Relator to execute an amended lease in July 2012. *Id.* ¶ 46. That lease set the total monthly amount as $1,653.00, $50.00 more than permitted under Gregory's HAP contract. *Id.* ¶ 46; *see also* July 2012 Lease, Mot. Ex. 9. Moreover, in connection with his December 2011 request to raise the total monthly payment, Gregory falsely stated to DCHA that the current rent was $1,603.00 per month, when in fact, as noted above, Gregory charged Carmichael $1,700.00. Gov't Compl. ¶ 47.

### V. GREGORY RECEIVED TENS OF THOUSANDS OF DOLLARS OF HOUSING ASSISTANCE PAYMENTS BASED ON HIS FALSITIES.

During the time that Carmichael rented the Property from Gregory, Gregory received $82,333.00 in federal funds in the form of housing assistance payments under the Program. Gov't Compl. ¶ 48. Specifically, by virtue of his agreements with DCHA, Gregory requested and received the following payments of federal funds from DCHA under the Program by virtue of his rental with Carmichael:

a. On October 28, 2008, an initial payment of $90.00;

b. In November and December 2008, two (2) monthly payments of $898.00 each, totaling $1,796.00;

    c.       In December 2008, an additional payment of $1,148.00 to account for additional sums sought for October and November 2008;

    d.       From January 2009 to May 2010, seventeen (17) monthly payments of $1,422.00 each, totaling $24,174.00;

    e.       In June and July 2010, two (2) monthly payments of $1,391.00 each, totaling $2,782.00;

    f.       From August 2010 to June 2011, eleven (11) monthly payments and one (1) adjustment payment amounting to $1,603.00 per month, or $17,633.00 in total;

    g.       From July 2011 to June 2012, twelve (12) monthly payments of $1,585.00 each, totaling $19,020.00;

    h.       From July 2012 to August 2013, fourteen (14) monthly payments of $1,365.00 each, totaling $19,110.00; and

    i.       In December 2012, an additional payment of $1,047.00.

*Id.* ¶ 49; *see also* Payment Records, Mot. Ex. 10.  Also, during the course of Carmichael's rental of the Property, DCHA made three (3) abatement adjustments totaling $4,467.00, which it collected from Gregory.  *Id.* ¶ 50.  In sum, Gregory received 62 payments netting $82,333.00 in federal housing assistance payments by virtue of his lease to Carmichael under the Program and when Gregory was charging Carmichael amounts in excess of those allowed under his agreements with DCHA and Program rules.  *Id.* ¶ 51.

## PROCEDURAL HISTORY

Carmichael commenced this action on October 2, 2014, by filing a *qui tam* Complaint under seal pursuant to the FCA.  R.1 (Relator's Compl.).  After conducting a diligent investigation, the United States intervened in this action on September 23, 2015.  R.9 (Notice of Intervention). On October 2, 2015, the Court lifted the seal on this action and directed Relator to serve the initial

complaint on Defendant.  R. 10 (Order of 10/2/2015).  On January 26, 2016, Carmichael served the Complaint on Gregory together with a summons directed to Gregory.  R.11 (Return of Service).  The United States filed and served its Complaint in Intervention on Gregory on March 25, 2016.  R.12 (Compl. in Intervention).

Gregory did not appear or respond to either Relator's Complaint or to the Government's Complaint in Intervention.  Accordingly, on May 16, 2016, the United States filed an affidavit of default of against him.  R.13 (Aff. of Default).  The Clerk of the Court entered default against Gregory on May 16, 2016.  R.15 (Entry of Default).  Despite affording him a several month period to cure his default, Gregory has failed to appear in this action to date.

## ARGUMENT

"Obtaining a default judgment under Rule 55 is a two-step process.  Once default has been entered, the first step, the plaintiff may move for default judgment." *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 945 F. Supp. 2d 81, 85 (D.D.C. 2013) (Rothstein, J.) (granting motion for default judgment) (citing Fed. R. Civ. P. 55).  "While default establishes the defaulting party's liability for the well-pleaded allegations of the complaint, it does not establish the amount of damages for which a defendant is liable." *Id.* (internal citations omitted).  Instead, the Court must either (i) find the amount of damages can be computed with certainty based on the allegations in the complaint; or (ii) make a determination of the sum to be awarded, which may be based on affidavits or documentary evidence.  *Fanning*, 113 F. Supp. 3d at 174 (determining damages based on documentary materials) (citing *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) (Urbina, J.) (finding amount of damages could be computed with certainty)); *see also United States v. TXL Mortg. Corp.*, Civ. A. No. 15-1658 (JEB), 2016 WL 5108019, at *1 (D.D.C. Sept. 20, 2016) (entering default judgment in favor of the United States on FCA presentment claim).

Accordingly, on a motion for default judgment, a plaintiff must show (a) that the well-pleaded facts are sufficient to establish the legal requirements of the causes of action pled by plaintiff, and (b) that there exists an adequate basis for the claimed damages. At bottom, "[t]he determination of whether default judgment is appropriate is committed to the discretion of the trial court." *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (Huvelle, J.) (entering default judgment).[3] Here, no hearing should be required as the facts alleged in the Complaint in Intervention adequately support the Government's FCA claim, and the remedies sought by the Government are appropriate.

## I.   THE WELL-PLEADED FACTS IN THE GOVERNMENT'S COMPLAINT ESTABLISHES GREGORY'S LIABILITY ON THE GOVERNMENT'S PRESENTMENT CLAIM FOR EACH OF THE 62 REQUESTS FOR PAYMENT.

The facts pled in the Government's Complaint, which the Court accepts as true for purposes of this Motion, establish Gregory's liability on the Government's Presentment Claim in this action for each of the 62 requests for payments of federal funds from DCHA under the Program by virtue of his rental with Carmichael.

### A.   Legal Standard for an FCA Presentment Claim.

For a Presentment Claim under Section 3729(a)(1)(A), a complaint must allege that: "'(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false.'" *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 121-22 (D.D.C. 2014) (Brown Jackson, J.) (quoting *United States ex rel. Head v. Kane Co.,* 798 F. Supp. 2d 186, 203 (D.D.C. 2011) (Kessler, J.)).

---

[3]   Because "default judgments are generally disfavored by courts" (*see Creecy v. Kellibrew*, 292 F.R.D. 116 (D.D.C. 2013)), and in the interests of justice, the Government waited to file this motion for several months to provide Gregory an opportunity to appear and be heard in this matter. Gregory has neither appeared in this action nor sought to vacate the Clerk's entry of default as of this date.

Under the FCA, the term "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government . . . (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]" 31 U.S.C. § 3729(b)(2).

A claim can be false under a variety of theories, including (i) when it is a paradigmatic false claim (*i.e.*, a claim that facially contains inaccurate facts or overcharges); (ii) when it contains an express or implied certification of compliance with requirements; or (iii) when it is submitted on a contract induced by falsities or fraud. *See, e.g., Computer Scis.*, 53 F. Supp. 3d at 117, 122; *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 118 (D.D.C. 2015).

The terms "knowing" and "knowingly" under the FCA "(A) mean that a person, with respect to information -- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

Section 3729(a)(1)(A) contains no express materiality requirement. *See* 31 U.S.C. § 3729(a)(1)(A). Nonetheless, when a Presentment Claim rests on certification "with a statutory, regulatory, or contractual requirement," that requirement "must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Services, Inc. v. United States ex rel. Escobar ("Escobar")*, 136 S. Ct. 1989, 1996 (2016). Material

in this context "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002. Materiality is satisfied (i) if a reasonable person would attach importance to the false representation in determining his or her choice of action in the transaction; (ii) if the defendant knew or had reason to know that the recipient of the representation would attach importance to the specific matter in determining his or her choice of action; or (iii) if the representation would likely induce a reasonable person to manifest his or assent. *Id.* at 2002-03 (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943) (where original contract was obtained through collusive bidding, initial "taint entered into every swollen estimate which was the basic cause for payment of every dollar paid"); *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (1931) (an undisclosed fact was material because "[n]o one can say with reason that the plaintiff would have signed this contract if informed of the likelihood" of the undisclosed fact)).

Accordingly, for purposes of this action, the elements of a Presentment Claim are:

1. the defendant submitted or caused to be submitted a claim for government funds;
2. that claim was false;
3. the falsity in the claim was "material;" and
4. the defendant acted "knowingly," both as to the falsity and materiality of the claim -- *i.e.*, defendant "knew" both that the claim was false and that the claim's falsity was material.

*See Computer Scis.*, 53 F. Supp. 3d at 121-22; *Escobar*, 136 S. Ct. at 1996.

### B. The Allegations in the Government's Complaint Satisfies the Legal Standard for a Presentment Claim.

The well-pleaded allegations in the Government's Complaint satisfy every element for a FCA Presentment Claim, the first cause of action in the Complaint.

*First*, Gregory's requests for federal funds from DCHA under the Program by virtue of his rental with Carmichael clearly constitute "claims" under the FCA. That is, Gregory presented a

request for payment to DCHA for funds provided by HUD. These requests are cognizable under the FCA. *See, e.g., Doe v. Gormley*, Civ. A. No. 15-2183, 2016 WL 4400301, at *5 (D. Md. Aug. 17, 2016) (finding complaint stated FCA claim based on allegations that landlord charged tenant more than permitted under Program rules and agreement) (collecting similar cases).

*Second*, Gregory's requests for Program funds were false under either an implied falsity or fraudulent inducement theory. As to the former, by submitting requests for payment Gregory impliedly certified his compliance with Program rules requiring him to charge only the permitted rent to Carmichael; and by violating those terms his claims for Program funds were false. *See Escobar*, 136 S. Ct. at 2000-01 (recognizing theory as to "half-truth" situations without deciding full scope of theory, "[w]e need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment[.]"); *United States v. Sci. Applications Int'l Corp. ("SAIC")*, 626 F.3d 1257, 1269 (D.C. Cir. 2010) (recognizing theory, holding that every claim for payment impliedly certifies compliance with material terms, including "pre-printed" claim forms); *see also Gormley*, 2016 WL 4400301, at *5 (citing, among others, *United States ex rel. Wade v. DBS Invs., LLC*, Civ. A. No. 11-20155, 2012 WL 3759015, at *3 (S.D. Fla. Aug. 29, 2012) ("a landlord commits fraud when that landlord endorses or presents for payment housing assistance payment checks while knowingly receiving additional payments in excess of that approved")).

As to the latter, the facts alleged in the Complaint show that Gregory never had any intention of abiding by the requirements of his HAP Contract and related agreements when he signed them. Indeed, immediately after signing those documents, Gregory began to charge Carmichael almost $100 more than permitted under those agreements. As such, Gregory's participation in the Program was procured by fraud, and each claim made under that Program

relating to Carmichael's lease is a false claim. *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 197 (D.C. Cir. 1995) (reversing dismissal of FCA suit, recognizing fraudulent inducement theory) (citing *Hess*, 317 U.S. at 543 (where original contract was obtained through collusive bidding, initial "taint entered into every swollen estimate which was the basic cause for payment of every dollar paid")); *see also See Computer Scis.*, 53 F. Supp. 3d at 130.

*Third*, the falsity in Gregory's claims were material. As alleged in the Government's Complaint, the whole purpose of the Program is to assess the reasonable rent for the participating property and the portion of the rent the beneficiary can pay based on his or her financial condition. *See* Gov't Compl. ¶ 17. By charging more than the rent permitted, a landlord is in essence requiring the low-income tenant to pay more than the amount the housing authority has determined the tenant can pay. Consequently, courts have held that unlawful extra or side rent agreements such as the one presented here are material to decisions to pay housing assistance. *See, e.g., DBS Invs.*, 2012 WL 3759015, at *4 ("Defendants' actions were material because their agreement to abide by the HAP Contract and not collect excess rent greatly influenced the . . . Program's decision to make or continue the HAP subsidy payments to Defendants."); *see also* Gov't Compl. ¶ 56 ("Gregory's false claims led the DCHA to make payments of federal funds that, absent the falsity, it would not have made[.]").

*Fourth, and lastly*, the facts alleged in the Government's Complaint support a reasonable inference of knowledge. Indeed, not only has the United States pled Gregory's scienter generally -- as it is permitted to do under the Rules, Fed. R. Civ. P. 9(b), *see* Gov't Compl. ¶ 57 -- but it has pled direct facts showing Gregory's knowledge and/or recklessness. For example, the United States alleges that Gregory was well aware of the authorized rent, including (i) because he was told directly by DCHA what it would be; and (ii) because he tried to change the authorized rent in

2012.  The United States has also alleged facts showing that Gregory simply did not unknowing receive overpayments -- *i.e.*, the United States has pled that Gregory executed revised leases with Carmichael requiring her to pay more than permitted.  These facts clearly give rise to a reasonable inference of knowledge or recklessness; and thus, satisfy the Government's burden for default judgment.

## II.  THE TREBLE DAMAGES AND CIVIL PENALTIES SOUGHT BY THE GOVERNMENT ARE APPROPRIATE.

The Government's request for FCA damages and penalties is appropriate because an adequate basis for damages exists in this case.  Once the Government establishes liability under the FCA, it is entitled to three times its single damages and not less than $5,500 in civil penalties for each false claim or statement.  31 U.S.C. § 3729(a)(1).[4]

As to damages, the FCA provides that the Government's damages recovery is equal to "3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).  The D.C. Circuit has long interpreted this provision to impose liability "for those damages that arise because of the falsity of the claim, *i.e.*, only for those damages that would not have come about if the defendant's misrepresentations had been true."  *Planning Research*, 59 F.3d at 200 (citing with approval *United States v. Miller*, 645 F.2d 473, 475-76 (5th Cir. 1981), and *United States v. Hibbs*, 568 F.2d 347, 351 (3d Cir. 1977)); *see also SAIC*, 626 F.3d at 1278.

---

[4]   The original minimum penalty set forth in the FCA was $5,000.  31 U.S.C. § 3729(a)(1). Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per violation (i.e., for each false claim, false record, or false statement) for violations occurring on or after September 29, 1999.

The specific damages methodology to employ in any particular FCA case, however, necessarily turns on circumstances of the underlying events giving rise to liability. Indeed, "[d]amages under the FCA are to be determined in a flexible manner to ensure proper recovery of direct, and not consequential, damages resulting from the making of a false claim." *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 44 Fed. Cl. 141, 148 (1998). This flexibility gives full effect to Congress's expansive intent in enacting the FCA "to reach all types of fraud, without qualification, that might result in financial loss to the Government," *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968), and reinforces Justice Holmes's oft-repeated holding that "[m]en must turn square corners when they deal with the Government." *Rock Island, Ark. & La. R.R. v. United States*, 254 U.S. 141, 143 (1920).

The D.C. Circuit's holding in *SAIC* recognized the flexibility in FCA damages methodologies, adopting a "benefit of the bargain" holding to cases where the fraud was in the performance of a bilateral contract. 626 F.3d at 1278. Specifically, the *SAIC* court wrote, "[i]n a case where the defendant agreed to provide goods or services to the government, the proper measure of damages is the difference between the value of the goods or services actually provided by the contractor and the value the goods or services would have had to the government had they been delivered as promised." *Id.* The D.C. Circuit went on to note that "[u]nder this benefit-of-the-bargain framework, the government will sometimes be able to recover the full value of payments made to the defendant, but only where the government proves that *it received* no value from the product delivered." *Id.* at 1279 (emphasis added).

The *SAIC* court went on to identify one particular class of cases where the United States would be to recover the full value of its payments, namely:

> where the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government

> can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages.

*Id.* (citing *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 473 (5th Cir. 2009) (calculating damages as the amount the government paid to the defendants where "[t]he contracts entered . . . did not produce a tangible benefit" to the government and were instead part of a grant program designed to award money to deserving small businesses); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir.2008) (concluding that the defendant, who submitted false claims for Medicare and Medicaid payments, was required to repay the full amount of the claims as damages because the defendant "did not furnish any medical service to the United States," and instead effectively sought a government subsidy to which it was not entitled)).

This case falls firmly within that class of cases. Here, the Government sought not to procure housing for its own employees or officials, but rather to dispense a benefit to a third-party, Carmichael, to allow her to live in, and afford, a safe, sanitary, and otherwise appropriate housing environment. That is, Gregory's participation in the Program did not produce a tangible benefit to the United States itself, but instead through his falsehoods he "effectively sought a government subsidy to which it was not entitled." *SAIC*, 626 F.3d at 1279 (describing holding of *Rogan*, 517 F.3d at 453). Consequently, the United States' FCA single-damages here are the full value of the payments it made to Gregory relating to Carmichael's lease of the Property.

Therefore, tabulating the amounts owed, the single-damages in this case are $82,333.00, *i.e.*, the net sums Gregory received from the Program during his lease to Carmichael as evidenced by the allegations in the Government's Complaint and the payment records enclosed herewith. *See* Gov't Compl. ¶ 49; *see also* Payment Records, Mot. Ex. 10. Trebling these figure yields a total treble-damages amount of $246,999. As noted above, in addition, the United States is entitled to a minimum of $5,500 per false claim submitted. Gregory submitted 62 false claims for housing

subsidies relating to Carmichael's lease as evidenced by the allegations in the Government's Complaint and the payment records enclosed herewith. *See* Gov't Compl. ¶ 49; *see also* Payment Records, Mot. Ex. 10. Accordingly, the Government is entitled to at least $341,000 in civil penalties; or a total combined recovery of $587,999.

### III. THE GOVERNMENT AND RELATOR AGREE THAT RELATOR SHOULD RECEIVE A 15-PERCENT SHARE UNDER THE FCA'S *QUI TAM* PROVISIONS.

Pursuant to the FCA's *qui tam* provisions, a relator is entitled to a share of the Government's recovery should the Government prevail in an action in which the Government has intervened. 31 U.S.C. § 3730. Specifically, Section 3730(d)(1) provides:

> If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.

31 U.S.C. § 3730(d)(1). Here, the Government and Relator agree that Relator should receive a Relator's share of 15 percent. Accordingly, the parties agree that, if and when the Government is able to collect sums from Gregory as a result of the requested default judgment, the United States shall remit 15 percent of those sums to Carmichael.

\* \* \*

## CONCLUSION

For the foregoing reasons, the United States and Relator respectfully request that the Court enter default judgment against Gregory on Count I of the Government's Complaint in a total amount of $587,999, consisting of $246,999 in treble damages and $341,000 in civil penalties, subject to Relator's subsequent motion for attorneys' fees, expenses, and costs. The United States and Relator also respectfully request that the Court set Relator's share in this *qui tam* action at 15 percent pursuant to 31 U.S.C. § 3730(d)(1).

As noted above, should the Court grant this Motion, Relator and the United States consent to the voluntary dismissal of their remaining claims without prejudice, and thus, Relator and the United States enclose herewith a proposed Final Order for this action.

Respectfully submitted,

| | |
|---|---|
| CHANNING D. PHILLIPS, D.C. Bar #415793<br>United States Attorney | D.C. TENANTS' RIGHTS CENTER |
| DANIEL F. VAN HORN, D.C. Bar #924092<br>Chief, Civil Division | By:   */s/ Marc Borbely*<br>MARC BORBELY, D.C. Bar #489871<br>406 Fifth Street NW, Suite 300<br>Washington, DC 20001<br>(202) 681-6871 |
| By:   */s/ Brian P. Hudak*<br>BRIAN P. HUDAK<br>Assistant United States Attorney<br>555 Fourth Street, NW<br>Washington, DC 20530<br>(202) 252-2549 | *Attorney for Relator Bridgette Carmichael* |

*Attorneys for the United States of America*

Dated:  February 17, 2017